## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

JOHN DOE MC- 88,                                        Case No.

          Plaintiff,                              Hon.

vs.

THE UNIVERSITY OF MICHIGAN,
THE REGENTS OF THE UNIVERSITY
OF MICHIGAN (official capacity only),

          Jointly and Severally,

          Defendants.

---

Michael A. Cox (P43039)
Jackie J. Cook (P68781)
**THE MIKE COX LAW FIRM, PLLC**
Attorneys for Plaintiff
17430 Laurel Park Dr. N., Ste. 120E
Livonia, MI 48152
734.591.4002
mc@mikecoxlaw.com

David J. Shea (P41399)
Ashley D. Shea (P82471)
**SHEA LAW FIRM PLLC**
Attorneys for Plaintiff
26100 American Dr., Ste. 200
Southfield, MI 48034
248.354.0224
david.shea@sadplaw.com

---

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, John Doe MC-88, by and through his attorneys,

Michael A. Cox, Jackie Cook and The Mike Cox Law Firm, PLLC, as well as David

1

J. Shea, Ashley D. Shea and Shea Law Firm PLLC, and for his Complaint against
The University of Michigan ("UM") and the Regents of the University of Michigan
("Regents"), collectively referred to as "Defendants," states as follows:

## I.    <u>INTRODUCTION</u>

1.    While employed as a physician by UM from the early 1960s until 2003,
Dr. Robert Anderson (Anderson) used his position to sexually assault university
students, many of whom were athletes.

2.    As early as 1968, or on information and belief even earlier, UM
received complaints from male students about Anderson sexually assaulting them
during putative medical examinations.

3.    In 1979, UM removed Anderson from his position as University Health
Services (UHS) Director after receiving repeated complaints that Anderson was
sexually assaulting male students during medical examinations on campus.

4.    UM then moved Anderson to the position of full-time Athletic
Department physician, and Anderson continued sexually assaulting male student
athletes, many of whom were attending UM on athletic scholarships, or with grants-
in-aid, or as members of various sports teams, including among others, football,
wrestling, hockey, gymnastics, basketball, baseball, and track, until he retired in
2003.

5.    To UM, the Athletic Department became the perfect place to hide

Anderson's past, present, and future sexual abuse of young men from public disclosure. The fact Anderson was given free rein to abuse hundreds – perhaps thousands – of male athletes with impunity was, in the end, a calculated risk worth taking by Defendants for the greater good of UM.

6.     While a UM undergraduate student, Plaintiff participated on an athletic team.

7.     Plaintiff was required by the UM Athletic Department's leadership to see only Anderson for medical care while participating on a UM sports team, and Anderson sexually assaulted, abused, and molested Plaintiff, by nonconsensual genital manipulation under the guise of medical treatment.

8.     UM is responsible for Plaintiff's damages stemming from Anderson's sexual assaults on UM's campus, as UM placed vulnerable student athletes, like Plaintiff, in Anderson's care despite knowing he was a sexual predator.

9.     This is a civil action against UM for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiff as a result of the acts, conduct, and omissions of Defendants in their official capacity, and their respective employees, representatives, and agents relating to sexual assault, abuse, molestation, and nonconsensual sexual touching and harassment by Anderson against Plaintiff while a UM student.

10.     Plaintiff files this case anonymously because of the extremely sensitive

nature of the case as Plaintiff was a victim of sexual assault, and the suit will require disclosure of information "of the utmost intimacy"; Plaintiff is therefore entitled to protect his identity in this public filing by not disclosing his name. *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir., 2004), citing *Doe v. Stegall,* 653 F.2d 180, 185–86 (5th Cir., 1981).

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this is a civil action arising from the Constitution, laws and treaties of the United States, including but not limited to, Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*., and the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

12.    This Court has original subject matter jurisdiction under 28 U.S.C. § 1343 as this is a civil action authorized by law brought by a person to redress the deprivation, under color of a State Law, statute, ordinance, regulation, custom or usage, of a right, privilege or immunity secured by the Constitution of the United States or by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and a civil action to recover damages or to secure equitable relief under an Act of Congress providing for the protection of civil rights.

13.    This Court also has supplemental jurisdiction under 28 U.S.C. §

1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

14.    The claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681 *et seq*., and under Michigan Law.

15.    The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

16.    The events giving rise to this lawsuit occurred in Washtenaw County, Michigan which sits in the Southern Division of the Eastern District of Michigan.

17.    Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

18.    Plaintiff's Complaint is timely filed within the applicable statutes of limitations.

### III.    PARTIES

19.    Plaintiff is a resident of the State of Michigan.

20.    UM is a public university organized and existing under the laws of the State of Michigan.

21.    UM receives federal financial assistance and is therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

22.     The Regents of the University of Michigan is a body corporate, with the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

23.     Defendants are not immune from suit under the Governmental Tort Liability Act, M.C.L. § 691.1401, *et seq*., or any other statute.

## IV.   COMMON FACTUAL ALLEGATIONS

24.     From the early 1960s until 2003, Anderson was a physician employed by UM treating students on UM's Ann Arbor campus, during which time UM gave Anderson unfettered access to young college students, including young male athletes.

25.     UM appointed Anderson on or about September 1, 1966 as the Clinical Instructor in Internal Medicine and Clinical Instructor in Surgery, Medical School and the Senior Physician of UHS.

26.     It was sometime soon after beginning employment with UM that, according to Ambassador Ron Weiser, the current chair of the UM Regents, Anderson abused Ambassador Weiser while Weiser was a freshman wrestler at UM in 1963.

27.     On or about October 1, 1968, UM promoted Anderson to UHS Director, and Anderson continued as the Athletic Department's primary care physician and team physician for many of UM's athletic teams.

6

**UM was warned in 1968 by an undergraduate student that Anderson was a sexual predator**.

28.     In 1968 or 1969, a gay UM student, Gary Bailey, went for an examination by Anderson, an examination that Bailey later described to the Detroit News as "very traumatic."

29.     Bailey states "he (Anderson) had me drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis and genitals."  Bailey further states, "Back then you did not question a doctor's authority…He asked me to pull on his penis."

30.     Bailey filed a written complaint with the UM health service and filled out a form, complaining that Anderson had dropped his pants and asked him to fondle his genitals during the exam.

31.     No one from UHS or any other UM agency followed up with Bailey or contacted him as part of an investigation into Bailey's written sexual assault complaint.

32.     On information and belief, UM never acted on and/or investigated Bailey's complaint against Anderson.

**In 1969, a scholarship gymnast tried to talk to Coach Newt Loken about Anderson's conduct, and so gave notice to the Athletic Department and UM.**

33.     In 1969, former University of Oklahoma and Washington State gymnastics coach Ward Black saw Anderson for a physical examination for the first

time as a freshman scholarship gymnast at UM.

34.     During this 1969 physical Anderson digitally penetrated Mr. Black's anus.

35.     Afterward Mr. Black tried to express his concern about this act to his UM gymnastics coach, Newt Loken, by stating to Coach Loken words to the effect of "what was up with Dr. A?".  In response, Coach Loken patted Mr. Black on the knee, smiled a "wry Cheshire grin", and changed the subject.

36.     Based on that reaction, Mr. Black "knew he knew. We all knew he knew" and did not complain again.

37.     At that time Coach Loken was an agent of both the Athletic Department and UM.

38.     Coach Loken continued to coach the gymnastics team until 1983, and remained affiliated with the gymnastics program and Athletic Department until, at least, 2007.

39.     In 1973, Anderson fondled the genitals of another undergraduate man to the point of ejaculation. The complainant reported this incident in 1994 to the predecessor of Michigan's Department of Licensing and Regulatory Affairs (LARA).

40.     On information and belief, in the ordinary course of a reported sexual assault by a regulated professional, LARA would have contacted UM as Anderson's

employer. Yet, UM continued to employ Anderson until his voluntary retirement in 2003.

## UM was warned again in 1975 by an undergraduate student athlete that Anderson was a sexual predator.

41.     UM's head wrestling coach in 1975, Bill Johannesen, admitted that whenever one of his wrestlers went to Anderson they had to "drop their drawers" even if the injury was to the wrestler's elbow.

42.     In 1975, UM student and scholarship member of UM's wrestling team, Tad Deluca, gave notice of Anderson's sexual misconduct in a 10-page letter to Coach Johannesen, complaining, among other things, that "Something was wrong with Anderson, regardless of what you are there for, he *insists* that you 'drop your drawers and cough" (emphasis added).

43.     Neither UM, Coach Johannesen, nor any agents of UM investigated Deluca's complaints about Anderson's sexual assaults; instead Coach Johannesen took away Deluca's athletic scholarship and kicked him off the wrestling team.

44.     Deluca appealed to then Athletic Director Don Canham and provided him with a copy of the letter sent to Coach Johannesen, giving Director Canham notice of the allegations against Anderson.

45.     Director Canham did not investigate the sexual abuse complaints against Anderson, and instead, upheld the revocation of Deluca's athletic scholarship.

9

46.     Deluca had to hire an attorney and appeal to UM's Board of Intercollegiate Athletics to have his scholarship reinstated.

## UM was warned again in 1976 by a track athlete that Anderson was a sexual predator.

47.     Plaintiff John Doe MC-16, who filed a similar complaint against UM in Case 2:20-cv-10622-VAR-EAS in the Eastern District on March 8, 2020, attended UM in the 1970s on a track athletic scholarship.

48.     Anderson repeatedly groped John Doe MC-16's penis and testicles (and digitally penetrated his anus once) during approximately 25 visits to Anderson for a variety of illnesses and injuries.

49.     After one of those visits in 1976, John Doe MC-16 approached both his head coach, Jack Harvey, and assistant coach, Ron Warhurst, and told them that Anderson was touching and groping his penis and testicles during Anderson's medical examinations.

50.     Anderson had already digitally penetrated John Doe MC-16's anus at the time John Doe MC-16 told coaches Harvey and Warhurst about the genital groping, but John Doe MC-16 was too embarrassed to tell his coaches about the penetration.

51.     After reporting Anderson's "odd" or "weird" conduct to Coach Harvey and Coach Warhurst, John Doe MC-16 further asked to go to another physician so he could get medical assistance for his injury(s).

52.     Both Coach Harvey and Coach Warhurst laughed at John Doe MC-16's complaint and refused to send him to a different physician.

53.     It was this type of indifference and acceptance and promotion of Anderson's acts by coaches that normalized Anderson's acts as required medical acts or treatment for all athletes across all teams as just part of participating in UM athletics.

54.     This is even more so where the prior year Athletic Director Canham's indifference to Tad DeLuca's complaint about Anderson de facto normalized and enshrined Anderson's acts as simply "department policy" or protocol for the medical treatment of all athletes.

55.     During this same period in the mid-1970s, numerous track athletes called Anderson "pants down doctor."

## UM was warned again in 1979 by a graduate student that Anderson was a sexual predator.

56.     According to records of the Washtenaw County Prosecutor's Office, in 1979 a then-graduate student at the UM was seen by Anderson at the UHS when Anderson "gave undue attention to my genitals and rectal area. It was very physically and socially uncomfortable…he inserted his finger into my rectum for a period that was longer than any other hernia or rectal evaluation."

**57.**     This graduate student complained loudly to the desk clerk, and then an administrator, both of whom "dismissed" him and ordered a security guard to escort

11

him out of UHS, instead of investigating his allegation against Anderson.

**UM acknowledged in 1979 that Anderson was a sexual predator, breaks an agreement with a reporting victim, and then creates a new position in the Athletic Department especially for Anderson**.

58.     In the Fall of 1979, Plaintiff John Doe MC-73, *Doe-MC 73 v The University of Michigan et al*, EDMI Case No. 4:20-cv-11702-VAR-EAS, a then junior-year, gay student at UM became aware of a Monday night afterhours program sponsored by the UHS where UHS personnel treated sexual minorities in a confidential setting.

59.     Plaintiff John Doe MC- 73 went to one of these Monday night program sessions, filled out paperwork, including a health history form identifying himself as gay, and was seen by Anderson.

60.      In the exam room Anderson told Plaintiff John Doe MC-73 to drop or lower his pants (and underwear) and initially did what seemed like a sports physical on Plaintiff's penis.

61.     However, after this initial sports-like physical exam, Anderson moved in closer to the standing Plaintiff John Doe MC-73, who still had his pants down.

62.     Standing face-to-face with Plaintiff John Doe-MC 73, Anderson then stated: "It is a shame that you are circumcised.  It feels really good when I (Anderson) am masturbating to have the foreskin (on his uncircumcised penis) rub against the head of my (Anderson) penis."

63.    Plaintiff John Doe MC-73 realized that Anderson was "playing with himself" as he described his masturbatory habits to Plaintiff and Anderson's "breathing became heavy".

64.    Still stunned and intimidated by this authority figure doing such an act during a confidential medical exam, Plaintiff John Doe MC-73 did not move while Anderson continued.

65.    Soon after this exam by Anderson, Plaintiff John Doe MC-73 mentioned the assault at the after-hours clinic to a gay student he knew.  This student stated, "It sounds like you saw Dr. Anderson.  Everyone knows about him.  He always cops a feel."

66.    Plaintiff John Doe MC-73 was shocked and outraged by Anderson's assault.  Plaintiff John Doe MC-73 became especially concerned and worried for other gay young men who might treat in the future with Anderson and who may be emotionally vulnerable (as Plaintiff John Doe-MC 73 had himself been in some months before) such that a similar act by Anderson on those individuals may lead some to suffer further emotional turmoil or self-harm.

67.    This shock over Anderson's assault and worries about other struggling gay students led Plaintiff John Doe MC-73 to report Anderson's abuse to the UM-paid gay male advocate ("Advocate") who served as the coordinator of UM's Human Sexuality Office.

68.    The Advocate told Plaintiff John Doe MC-73 that his experience was "very similar" to a prior  complaint about Anderson sexually assaulting a gay male student at UHS, but that UM ended up doing nothing because it viewed it as a "he said, he said" situation when Anderson denied the prior assault.

69.    Plaintiff John Doe MC-73 filed a formal complaint with Thomas Easthope, the Vice President of Student Life Services, who Plaintiff understood to be the supervisor of Anderson.

70.    After the complaint was filed, the Advocate accompanied Plaintiff John Doe-MC 73 to a scheduled meeting at Easthope's office in UM's Administration Building.

71.    After hearing Plaintiff John Doe MC-73's retelling of Anderson's assault, Vice President Easthope told Plaintiff John Doe-MC 73 and the Advocate that Easthope "was very sorry" and that he "needed to do an investigation and I will get back to you."

72.    Easthope met with Plaintiff John Doe MC-73 and the Advocate approximately one week later.  At this second meeting Easthope told Plaintiff John Doe MC-73, "He (Anderson) does not deny your allegations against him" and that Anderson had asked Easthope "to deliver an apology from Dr. Anderson."

73.    Easthope told Plaintiff John Doe MC-73 "Dr. Anderson is troubled, sick, and needing help…he's very sorry for any distress or upset he caused you."

14

74.     Easthope continued with words to the effect of, "My first thought was to fire him.  But he has a family and kids".  Easthope then stated words to the effect that if Anderson were fired then both he and his family would suffer financially.

75.     Easthope then offered the following proposal to resolve Plaintiff John Doe MC-73's claim:  "Would it be okay with you if Anderson is removed from his medical duties and moved to an administrative position where the University would keep him away from other students?"   Easthope further offered that Anderson "would not be able to treat patients in the University setting."

76.     From the context of Easthope's words, it was clear to Plaintiff John Doe-MC 73 that Easthope wanted Plaintiff John Doe MC-73 to not publicly complain or seek any kind of claim against Anderson or UM if Easthope would ensure that Anderson would not be able to treat any more patients while Anderson was at UM.

77.     Plaintiff John Doe MC-73 verbally agreed to Easthope's proposal, and Easthope sealed the deal when he and Plaintiff "shook hands on that (agreement)." Easthope told Plaintiff "thank you for having the guts to come forward."

78.     Plaintiff John Doe MC-73 never thought to follow up on his agreement with Easthope because, in Plaintiff's mind, Easthope was a high ranking UM official and there was no reason to distrust someone like that, especially at the UM, the university that Plaintiff has loved for decades.

79.    Instead of moving Anderson to an administrative position where Anderson could not treat any more students, as promised to Plaintiff John Doe-MC 73, Easthope and other high ranking executives at UM merely moved Anderson from UHS and put him in a position where he could, once again, treat and abuse young male students as the first paid, full-time Athletic Department physician.

80.    According to longtime UM athletic trainer Russell Miller, Athletic Director Don Canham, a legendary and powerful figure at the UM, "worked out a deal" to bring Anderson over to the Athletic Department.

81.    Anderson himself told the Ann Arbor News that Canham created a brand-new position for him as the "formal team physician" in 1980.   See the Ann Arbor News, June 10, 1999, p. B7.

82.    Protected by UM executives, Anderson used this new paid position to abuse hundreds of UM male athletes.

83.    When questioned in 2018, Thomas "Tom" Easthope told Detective West of the UM Division of Public Safety and Security, a different account of John Doe MC-73's complaint and left out his agreement with Plaintiff John Doe-MC 73.

84.    Instead he told Detective West that a UM Student Life employee and local UM activist (presumably the Advocate) told Easthope that Anderson had assaulted several members of the gay community at UM.

85.    Easthope, who as Vice President of Student Life had supervisory

16

oversight of the UHS, minimized Anderson's sexual abuse by depicting Anderson's actions as "fooling around with boys in the exam room."

86.     Indeed, the same gay UM Student Life employee who made the report to Easthope had personal knowledge of Anderson's abuse: when that Student Life employee was examined by Anderson during a routine physical, Anderson stuck his finger in the Student Life employee's anus, and when the employee jumped from pain and discomfort, Anderson stated, "I thought that you would have enjoyed that!"

87.     Detective West's report of that Easthope interview does not record any mention by Easthope of Plaintiff John Doe-MC 73 or the agreement Easthope made with Plaintiff John Doe MC-73.

88.     As told by Easthope to Det. West, Easthope says he decided to terminate Anderson but was nervous because Anderson was "big shot" at UM.

89.     Easthope reported to West that he confronted Anderson about knowing Anderson abused several people that were in the gay community  and that he was "fooling around in the exam rooms" with male students and Anderson "did not deny" Easthope's accusations.

90.     According to Easthope, Easthope told Anderson, "You gotta go."

91.     Easthope then told West that after initially firing Anderson, Easthope stated he decided to allow Anderson to resign to avoid an employee termination fight which would delay Anderson's leaving his job, and presumably, the UM.

92.     During this time, Easthope was an agent of UM.

93.     According to Det. West, Easthope claimed he thought Anderson left campus in 1980, even though Anderson was a prominent part of the nationally known Michigan football team for the next two decades until 2003.

94.     Even if Easthope's account to Det. West is true, neither Easthope nor his superiors or subordinates followed up to ensure that Anderson left the UM after his severance from UHS.

95.     This despite that when Easthope was recently confronted about Anderson, Easthope estimated "I bet there are over 100 people that could be on that list (of young men abused by Anderson)."

96.     According to UM human resource records, instead of terminating Anderson from the UM, UM "demoted" Anderson effective January 14, 1980 and moved him to the Athletic Department to be the primary care physician.

97.     Dana Mills, the then Administrative Manager at the UHS, said the "V.P.'s Office" would have been responsible for Anderson's transfer to the Athletic Department.

98.     Anderson was highly regarded as a university physician, especially by leaders in the Athletic Department, including a longtime UM athletic trainer who called Anderson an "unbelievable team doctor"; another UM athletic trainer who called Anderson "very incredible"; and one longtime coach of the UM football

18

coaching staff during the 1980s, 1990s, and 2000s who called Anderson "a tremendous asset."

99. Indeed, UM went so far as to overtly and fraudulently conceal (with Anderson's assent) Anderson's predatory sexual conduct against college age males and intentionally conceal the reason for Anderson's termination/demotion, by praising Anderson in the published Acknowledgement preface of Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980.

100. The UM outright lied in this publication by telling the public: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him."

101. UM outright lied when it described Anderson's departure as voluntary and lauded his "leadership" when UM and its executives knew that (a) Easthope fired or transferred Anderson for his sexual assaults on male students, and (b) Anderson's termination or transfer was changed to a written demotion in his human resources file, through the efforts of Athletic Director Canham and other "V.P.s", so Anderson could go to the Athletic Department.

102.    After UM "demoted" the "big shot" Anderson to work full-time at the Athletic Department, Anderson had access to hundreds of male scholarship athletes (as well as non-scholarship male athletes), many from middle or working class families who could not afford to attend UM without an athletic scholarship, and were trained to unquestioningly endure physical and emotional discomfort without complaining in order to compete in their sport.

103.    The demotion gave Anderson free reign to abuse hundreds of male athletes like Plaintiff with impunity.

104.    After his demotion for sexually abusing students on campus, Anderson was held up and regarded as "the" medical authority of the athletic department, including the football team, for decades by authority figures of the UM athletic department, including its athletic director, Don Canham.

**UM's condoning of Anderson's assaultive conduct is further shown by trainer Paul Schmidt's comments to a freshman football player in the 1980s.**

105.    Plaintiff John Doe MC-27, who filed a similar complaint against UM in Case 2:20-cv-10785-VAR-EAS on March 26, 2020, attended UM in the 1980s and 1990s on athletic scholarship for football.

106.    During John Doe MC-27's first physical examination by Anderson, Anderson groped, fondled, and cupped John Doe MC-27's penis and testicles for an excessively long time while Anderson's face was within inches of John Doe MC-27's penis and testicles.

20

107.   John Doe MC-27 encountered longtime UM trainer Paul Schmidt and other trainers as he (John Doe MC-27) exited this initial, inappropriate freshman football physical examination by Anderson.

108.   Seeing that John Doe MC-27 was exiting his examination by Anderson, trainer Paul Schmidt laughed and told John Doe MC-27 "get used to that (Anderson's examination)."

109.   The other trainers laughed as well, and it was clear to John Doe MC-27 that Schmidt and the other trainers knew what Anderson was doing in the exam room to athletes.

110.   It was this type of indifference and acceptance of Anderson's acts by trainers that also normalized Anderson's acts as required medical acts or treatment for all athletes across all teams as just part of participating in UM athletics.

111.   Schmidt is still employed by UM and, on information and belief, is currently the Assistant Athletic Director for the Athletic Department.

**Evidence of Anderson's continued authority and influence within the Athletic Department and UM's failure to act despite repeated assaults and reports of repeated assaults.**

112.   It is a sign of Anderson's power and influence at the UM that UM adopted mandatory student-athlete physicals only after Anderson recommended this mandate; which, of course, gave Anderson increased access to male student-athletes.

113.   It is a further sign of Anderson's power and influence at the UM that

Anderson travelled with the UM's vaunted football team, stayed in the football team's hotel as part of the Athletic Department's traveling party, was included in every football team end-of-year bowl VIP traveling entourage, and was a fixture on the sidelines during Michigan's nationally televised football games.

114.    Archived records at the UM's Bentley Library describe Anderson's influence within the Athletic Department was such that he was able to squash a proposal to allow the athletes more latitude in choosing treatment by doctors other than Anderson.

115.    Anderson remained in a position of power and authority within the Athletic Department even though written exit evaluations by graduating senior athletes routinely gave Anderson poor grades for his treatment of the student-athletes that he was preying on.

116.    Anderson treated UM athletes for every medical ailment, complaint, and injury as their UM-assigned internist. He served as their first medical point of contact no matter the injury or ailment at issue, including everything from a cold to the flu to broken bones.

117.    During his employment, agency, and representations with UM, Anderson sexually assaulted, abused and molested male student athletes by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to medically unnecessary genital manipulation and digital anal penetration.

22

118.   Because UM took no action to investigate the complaints from students that began as early as 1968, or earlier, and took no corrective actions even after Easthope attempted to fire Anderson in 1979, students and student-athletes were sexually assaulted, abused and molested by Anderson through nonconsensual digital anal penetration, and nonconsensual sexual touching of genitals.

119.   The students he abused did not understand (as UM did) the nature of the treatment Anderson administered, or rather that his putatively necessary medical treatment was not done to heal them but rather to satisfy Anderson's sexual desires.

120.   In particular, because so many were victimized, student athletes "normalized" Anderson's abuse and accepted it as part of what they had to endure as an athlete already under intense, grueling training and physical demands, and they did not know that they were victims of assault at the time it occurred.

121.   Although uncomfortable with the treatments, the student athletes were led to believe by those in authority, including Athletic Director Canham, coaches and trainers, and Anderson, that the treatments were medically necessary or helpful.

122.   On July 18, 2018, UM alumnus, Tad Deluca, sent a letter to Warde Manuel, UM Athletic Director, notifying Manuel—as he did Don Canham in 1975— of Anderson's sexual assault while Deluca was a student between 1972 to 1976.

123.   On information and belief, UM then requested the UM police department to open a non-public investigation, but UM did not take further action to

23

notify former students and/or the public about the allegations and/or investigation until 19 months later.

124.   As UM President Schlissel admitted on February 20, 2020, "Our (UM) police found indications that U-M staff members were aware of rumors and allegations of misconduct during Anderson's medical exams."

125.   As stated above, at least one of the UM Board of Regents has personal knowledge that the complaints received on July 18, 2018, were and are true:  Ron Weiser, chairman of the UM Board of Regents.

126.   Another member of the UM Board of Regents, Regent Paul Brown, recently publicly stated that three members of his family who were student-athletes at UM were also sexually assaulted by Anderson.

127.   Nonetheless, neither the UM nor the Board of Regents took any steps to notify the public nor its alumni student-athletes about Anderson's abuse until compelled to do so by the press in February 2020.

128.   UM and the UM Board of Regents' 19-month delay in notifying the public and alumni about Anderson's abuse of student-athletes is consistent with the pattern of UM's recent reactions to sexual abuse allegations: for several years, Defendants have been under intense media, public, and government scrutiny regarding their mishandling of sexual harassment and sexual assault by faculty members, including, but not limited to by Professor David Daniels; several Title IX

complaints by students in recent years; and complaints of sexual misconduct and inappropriate behavior against Provost Martin Philbert.

129.   At all relevant times, Anderson maintained an office at UM in Ann Arbor, Michigan.

130.   At all relevant times, Defendants were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or UM.

131.   At all relevant times, including the years 1966 to 2003, Anderson was acting within the course and scope of his employment or agency with UM.

## V.   **PLAINTIFF'S SPECIFIC FACTUAL ALLEGATIONS**

132.   Plaintiff was recruited out of high school by college football programs from across the Nation and chose to attend UM to play football.

133.   Plaintiff chose UM because, among other reasons, its tradition, the universal respect for its degrees, its national reputation for leadership and integrity, and the bond he built with the coaches on staff during the recruiting process.

134.   When Plaintiff was recruited, UM's football coaches assured Plaintiff and his parents that he would be protected at UM.

135.   Plaintiff (and his parents) also trusted and relied on his coaches' statements and representations made during the recruiting process that they would protect Plaintiff and ensure that UM and the team would  take care of Plaintiff's

athletic, academic, and medical needs while an athlete at UM.

136.   More specifically, Plaintiff trusted and relied on his coaches' specific representations that they would, among other things, take care of Plaintiff's (a) athletic needs through excellent coaching and training; (b)  academic needs through tutoring and other academic support provided by the UM and its Athletic Department, if needed; and (c) medical needs through free quality health care to treat any injuries and illnesses Plaintiff incurred during his time on the team, which included access to UM's world-renowned hospital, and a team of excellent doctors who were represented as ethical, and would only do good, not harm, to the Plaintiff and his body during the course of their medical treatments.

137.   During his time on the team in the 1990s, Plaintiff further trusted and relied on his UM coaches' and trainers' continuing representations that the medical staff should and would address all of his medical needs, and that because UM and the team were first class organizations  – literally, the "leaders and the best" –  any and all medical treatment and rehabilitation services would only be done if medically necessary, with the best treatment available, by the best doctors possible, and only if appropriate and ethical to ensure Plaintiff became and stayed healthy, and not for any purpose that would do any harm to Plaintiff's body or mind.

138.   Plaintiff encountered a football program and culture where the coaches set the tone to ensure every detail was done in a much more comprehensive, thought-

out, and thorough manner than anything he had encountered before -- from the drills to conditioning to diet to even off-the-field activities, such as academics and how one should conduct himself as a member of the team.

139.   Not only was program more thorough and comprehensive than anything the Plaintiff had encountered before, but practices were longer, the energy level more intense, and the expectation to do and endure more was much higher.

140.   Before each football season began, Plaintiff was required to see Anderson for a physical examination to be cleared to play football.

141.   The team coaches and trainers also told Plaintiff that Anderson was Plaintiff's primary care physician and that Plaintiff should see Anderson for any minor sports injury or common illness.

142.   And so, between physical examinations, treatments of injuries to various body parts, and treatments for illnesses such as colds and flu, Plaintiff saw Anderson at least six (6) or more times.

143.   On two (2) of those occasions Anderson digitally penetrated Plaintiff's anus.

144.   And, on five (5) different occasions Anderson also excessively played with and fondled Plaintiff's penis and testicles.

145.   Plaintiff considered or assumed these acts by Anderson were necessary requirements of participating on the UM football team and playing football in

college at the highest level.

146.   Plaintiff also assumed that these acts were "normal" or "customary" because many of his teammates told Plaintiff that Anderson did similar acts to the teammates.

147.   Plaintiff further assumed these acts were "normal" and "customary" because football team trainers joked about them.

148.   Also, Anderson because appeared to successfully address any minor medical complaint that Plaintiff had ever had; Plaintiff assumed these acts were medically necessary.  And from conversations with fellow teammates, it appeared Anderson directly addressed their injuries or illnesses as well when they sought Anderson's treatment.

149.   As a result, and as a young college student without any medical training, it was Plaintiff's belief that these acts by Anderson were medically necessary acts even if Plaintiff did not understand why they were done.

150.   Conversely, if Anderson did unnecessary medical acts, Plaintiff did not have the training or experience to identify those acts as unnecessary even if they were different, uncomfortable, or unfamiliar to him.

151.   While Plaintiff competed on the football team as a recruited and desired athlete, Anderson was his assigned primary care physician.

152.   And since UM was responsible for the medical care of its student

athletes, Anderson's services were readily available to Plaintiff and free of charge.

153.   Plaintiff's head coach, assistant coaches, and trainers directed and required Plaintiff, and all other members of the football team, to see Anderson for all of their medical needs.

154.   It was further required and expected that all football players not only see Anderson for any ailment but also unquestioningly follow his procedures and orders.

155.   And just as Plaintiff, as a high-performing student athlete, was used to following orders of coaches, whether it was regarding diet, exercise, training, and even academic performance, Plaintiff fell in line when he was instructed to treat with Anderson – and no other primary physician – while he was a UM student.

156.   Since staying on the team and in games was critically important to Plaintiff and his teammates, they accepted the grueling physical conditions required to keep them there, including Anderson's treatments.

157.   Plaintiff felt uncomfortable about Anderson's acts taken in the guise of medical treatment but accepted the acts as customary requirements of the Michigan football program.

158.   Further, although the treatments made Plaintiff uncomfortable, Plaintiff was trained by his football and athletic training to do as he was ordered by those in positions of authority. Indeed, the physical and emotional rigors of college football

require high tolerance to physical and emotional pain.

159.   Plaintiff trusted his coaches' and trainers' representations that Anderson was a good physician and that he had to see Anderson for every ailment throughout Plaintiff's career, and so he trusted Anderson as his physician.

160.   Plaintiff also trusted and relied on his coaches' representations, made to him and his parents during the recruiting process, that they would take care of him; and then during his playing career, Plaintiff trusted and relied on his coaches' and trainers' representations that Anderson was a good, competent, and ethical doctor who would do Plaintiff no harm.

161.   At the time of Anderson's treatment – not knowing (a) Anderson's acts were motivated by a criminal sexual intent and (b) that UM knew of Anderson's criminality, yet intentionally and wantonly gave him access to sexually abuse male athletes like Plaintiff – Plaintiff trusted representations made to him that Anderson's actions, under the guise of medical treatment and in the confines of a medical examination room on UM's campus, were medically necessary and/or beneficial as treatment and/or diagnostic.

162.   When the abuse began, Plaintiff, a young and naïve man away from home, trusted Anderson as a medical professional and authority figure.

163.   Further, because the doctor-patient relationship is special, confidential and trusted, and given the fact Plaintiff's coaches and trainers relied on Anderson

and vouched for his reputation, Plaintiff relied on his confidential relationship with Anderson – and the coaches' and trainers' validation of Anderson – such that he could never contemplate that Anderson would commit sexual assaults in the guise of medical treatment.

164.   Plaintiff relied on his special doctor-patient relationship with Anderson because Plaintiff had no medical training or experience, while Anderson was a highly educated and experienced licensed medical doctor; so the differences in their respective educational and knowledge bases was such that Plaintiff was not aware that Anderson's nonconsensual genital fondling and/or anal penetrations were not medical treatment, but instead sexual assault, abuse, and molestation.

165.   As UM President Schlissel has stated, "The patient-physician relationship involves a solemn commitment and trust."

166.   Because UM took no action to investigate complaints since 1968, took no corrective action to stop Anderson's abuse, and knew of Anderson's sexual abuse of male students under the guise of medical treatment which put him in a position to commit further acts of genital groping and/or digital anal penetrations of male college athletes between the early 1960s and 2003, UM knowingly placed Plaintiff in a position where he would likely be sexually abused.

167.   And because of UM's failure to act, despite knowledge that Anderson was preying on male college students under the guise of medical treatment, Plaintiff

was in fact sexually assaulted, abused and molested by Anderson by nonconsensual digital anal penetration and genital fondling.

168.   The assault could have been prevented if UM had acted on and/or investigated complaints against Anderson that UM had notice of as early as 1968 and earlier.

169.   The assaults on Plaintiff could have been prevented if UM had warned Plaintiff or properly supervised Anderson or trained Athletic Department supervisors such as Plaintiff's coaches and trainers. But UM failed to do any of these things that would have prevented Plaintiff's sexual abuse.

170.   Through Anderson's position with UM and his notoriety and respect in the UM community, particularly among high-ranking UM coaches and administrators, Anderson used his position of authority as a medical professional to abuse Plaintiff without any reasonable supervision by UM.

171.   Plaintiff did not, and could not, consent to Anderson's purported medical treatments.

172.   All of Anderson's acts were conducted under the guise of providing medical care at his office at UM.

173.   The failure to give proper notice or to obtain consent from Plaintiff robbed him of the opportunity to reject Anderson's treatments.

## VI.   PLAINTIFF'S DAMAGES

174.   Plaintiff first learned Anderson was a serial sexual predator on or after February 19, 2020, when the news broke that several former students had come forward with stories of sexual abuse at the hands of Anderson under the guise of medical treatment while students at UM.

175.   The damages arise from two distinct and exclusive harms: (1) the revelation that Anderson's odd or weird acts, were not in fact, innocent odd or weird acts, but rather criminal sexual conduct motivated by Anderson's illegal sexual intent, and so Plaintiff is a sexual assault victim; and (2) the revelation that the UM – an integral part of Plaintiff's life and identity for decades  – foisted a sexual predator on Plaintiff in the guise of a competent and concerned medical physician.

176.   Since these revelations, Plaintiff has been suffering shame, shock, humiliation, emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, and disgrace.

177.   The news about Anderson has disturbed Plaintiff's innate sense of self-worth and self-identity, leading to anxiety and depression.

178.   Plaintiff has also suffered deeply, emotionally, and psychologically, in ways that have manifested physically, from discovering on February 19, 2020, that his beloved alma mater knew about Anderson's sexual assaults for decades; yet did nothing to stop Anderson.

179.   Aside from these understandable injuries, other harms include: (a) feeling betrayed because he was not protected by UM, coaches and trainers; (b) feeling betrayed because UM forced Anderson on him and his unsuspecting teammates knowing Anderson was a predator;  (c) worries and anxiety that friends and family may find out that Plaintiff was a victim; (d) anxiety about future interactions with the UM; and (e) extreme anxiety about how these harms will manifest themselves in Plaintiff's middle age and senior years.

180.   Despite knowledge about Anderson's misconduct, UM knowingly kept him in positions where he had direct and intimate access to prey upon college athletes, such as Plaintiff, from the early 1960s to 2003.

181.   These revelations have been traumatic and emotionally and psychologically damaging, forcing Plaintiff to relive the trauma of what he now knows to have been sexual assault.

182.   It has shattered Plaintiff psychologically and emotionally to learn the university he has spent his life being devoted to betrayed him and so many others by placing a sexual predator on staff where he had direct and unlimited access to young college students.

## VII.   THE   PHYSICIAN-PATIENT   FIDUCIARY   RELATIONSHIP CREATED BY THE UM DEFENDANTS

183.   Physicians like Anderson enjoy a power imbalance over patients, such as Plaintiff, in treatment because patients present with health concerns and are

expected to comply with physicians' orders, including undressing. *See* Sexual

Violation of Patients by Physicians: A Mixed-Methods, Exploratory Analysis of 101

Cases, Sexual Abuse 2019, Vol. 31(5) 503–523, available at

https://journals.sagepub.com/doi/10.1177/1079063217712217.

184.   In addition to the power imbalance, patients like Plaintiff often times

cannot recognize abusive acts because they do not understand or know what is or is

not medically necessary *See* Sexual Violation of Patients by Physicians: A Mixed-

Methods, Exploratory Analysis of 101 Cases, Sexual Abuse 2019, Vol. 31(5) 503–

523, available at https://journals.sagepub.com/doi/10.1177/1079063217712217.

185.   Among other reasons, it is this social power imbalance and the fact that

"physicians possess superior knowledge by virtue of their medical training" that the

American Medical Association finds the doctor-patient relationship to be a fiduciary

relationship.   Tanya J. Dobash, Physician-Patient Sexual Conduct: The Battle

Between The State and The Medical Profession, 50 Wash. & Lee L. Rev. 1725

(1993), available at https://scholarlycommons.law.wlu.edu/wlulr/vol50/iss4/17.

186.   In the same way, both the Sixth Circuit Court of Appeals and Michigan

courts recognize this fiduciary relationship between a doctor and his patient, where

"the patient necessarily reposes a great deal of trust not only in the skill of the

physician but in his discretion as well". *United States v. Tatum*, 518 F.3d 369, 373

(6th Cir. 2008); *Hammonds v. Aetna Cas. & Sur. Co.,* 7 Ohio Misc. 25 (N.D. Ohio

1965); *Utica Steel, Inc. v. Amormino,* No. 309112, 2014 WL 1401939, at *6 (Mich. App. Apr. 10, 2014).

187.   As pled above, UM ordered Plaintiff to see Anderson, and only Anderson, as his UM-assigned primary care physician during the time Plaintiff was a member of his team, despite knowing he was a sexual predator of male student-athletes.

188.   In this way, UM created a fiduciary relationship between Anderson and Plaintiff.

189.   Further, in doing so, UM became a fiduciary, both directly and vicariously, of the Plaintiff for all acts by Anderson during Anderson's physician-patient relationship with Plaintiff.

190.   And because UM forced this relationship on Plaintiff – a fiduciary relationship with Plaintiff's UM-chosen physician, Anderson – UM as a principal to its agent, Anderson owed certain duties under fiduciary and agency law to provide Plaintiff with more, not less information, regarding the true nature of Anderson's acts done during the course of medical treatment on the Plaintiff.

## VIII.  <u>FRAUDULENT CONCEALMENT</u>

191.   The statute of limitations is tolled when "a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled

to sue on the claim" under M.C.L. § 600.5855.

192.    Both Anderson, and Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, and directors, fraudulently concealed the existence of Plaintiff's claims, both before and after Plaintiff's initial examination with Anderson, by (1) concealing from Plaintiff that the uncomfortable procedures conducted during medical examinations were in fact sexual abuse, (2) concealing from Plaintiff that UM and its employees, agents, and representatives were aware of Anderson's sexual abuse and did nothing to stop it, (3) affirmatively telling Plaintiff the procedures were normal and/or necessary, (4) publishing a statement that Anderson was a renowned physician to be trusted and respected in a publication delivered to and read by university students, (5) concealing from Plaintiff that UM was aware of Anderson's abuse since at least 1968, thereby concealing UM's identity from Plaintiff as a "person who is liable for the claim," as set forth in more detail below.

## A.    Anderson's Fraudulent Concealment Imputed to UM.

193.    Anderson made affirmative representations to Plaintiff, referred to collectively as "Anderson's representations," that:

> a.    Anderson's anal penetrations and/or genital examinations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;
>
> b.    Anderson's anal penetrations and/or genital examinations were normal, necessary, proper, appropriate, legitimate, and/or

medically beneficial, when the patient is a healthy male between the ages of 17 and 24, with no reported issues related to his genitals and/or anus;

c.    Anderson's anal penetrations and/or genital examinations were just another required procedure athletes must endure as a part of the systemic athletic department culture in which athletes were rigorously disciplined to obey without question every requirement related to improving their physical health and, in doing so, adapting to overcome high levels of emotional, physical, and psychological stress and challenges; and,

d.    Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, and directors, were aware of Anderson's treatments, that they still required Plaintiff to be subjected to it, and that they believed the treatments to be normal, necessary, proper, appropriate, legitimate, and/or medically beneficial.

194.  Anderson's representations were false. The UM Public Safety Department's recent investigation involving contact with medical professionals establishes that extended genital examinations and digital anal penetrations are almost never needed for any medical treatment of any issues normally experienced by college athletes.

195.  Anderson knew the representations were false. He conducted the sexual assaults for no reason other than for his own empowerment, sexual gratification, and/or pleasure. Anderson knew the genital examinations and/or digital anal examinations were not proper, appropriate, legitimate, and/or considered within the standard of care by any physician of any specialty and/or sports therapist, particularly as the patients were young men (generally ages 17-25).

38

196.   Further, over the course of treating Plaintiff and his teammates and other athletes, on multiple occasions Anderson represented and stated his acts were "protocol", "what was necessary", "had to be done", or similar phrases, and/or Anderson represented that he was checking for an illness unrelated to the athlete's complaint that gave rise to the visit to Anderson, such as prostate and/or testicular cancer.

197.   These remarks normalized Anderson as just part of the comprehensive and thorough nature of major college sports, and major college physicals, such that it happened to everyone and was not outside the norm, and was the medical equivalent of a new and arduous drill or conditioning technique that Plaintiff encountered at UM, but not in high school.

198.   Anderson's representations were material, in that had Plaintiff known the representations were false, Plaintiff would have stopped seeking treatment from Anderson immediately.

199.   Anderson's representations were made with the intent that Plaintiff would rely on them as Anderson sought to continue sexually assaulting Plaintiff, and others, evidenced by the fact that Anderson did, in fact, continue sexually assaulting Plaintiff, and others.

200.   Anderson's representations were also made with the intent of concealing from Plaintiff that he had a cause of action against Anderson and/or UM.

201.   Plaintiff did, in fact, rely on Anderson's representations; indeed, Anderson's representations led Plaintiff to continue seeking treatment from Anderson, and had he known Anderson's representations were false, Plaintiff would have stopped treating with Anderson.

202.   Anderson knew, and Plaintiff was in fact, particularly susceptible to believing Anderson's misrepresentations because:

a.   Anderson's abuse continued while Plaintiff was a young and naïve adult;

b.   Anderson's representations were made within the context of a pervasive culture created by statements made by representatives of UM, including coaches, trainers, directors, and other leaders of the Athletic Department, that Anderson's treatments were necessary and Anderson was a competent and ethical physician, to be trusted and never questioned;

c.   Plaintiff had little or no prior experience with legitimate and appropriately performed treatments that involve genital examinations and digital anal penetrations, so it was impossible for Plaintiff to differentiate a legitimate and appropriately performed genital or anal examination from a sexual assault;

d.   Plaintiff could not have possibly known because there were no parents, coaches, guardians, caregivers, and/or other medical professionals in the room during the genital and anal examinations to observe, question, and/or discover that Anderson's treatments were sexual assaults, and this concealment from other adults deprived them of the opportunity to inform Plaintiff that he had been sexually assaulted and had a cause of action;

e.   Based on Neuroscience, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age of 25;

f.   Based on Neuroscience, as the prefrontal cortex of the brain matures teenagers are able to make better judgments;

g.   Plaintiff was intimidated by Anderson's notoriety and reputation and therefore believed his representations;

h.   Plaintiff trusted Anderson due to his notoriety and reputation;

i.   Plaintiff was compelled by Anderson to undergo genital and anal examinations like other athletes and not question them if he wanted to stay on the team and remain at UM to earn his college degree;

j.   Plaintiff was not aware of any other students coming forward with allegations of abuse, particularly since Anderson and UM concealed any such allegations from students and the public in general and since the culture of the Athletic Department normalized Anderson's treatments;

k.   Plaintiff had never previously heard about allegations in the media regarding sexual assaults or misconduct by Anderson, indeed because there was none; and

l.   Plaintiff was never told by Anderson that his conduct was sexual in nature, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from parents and others.

203.   Accordingly, Plaintiff did not know, could not have reasonably known, and was reasonably unaware of a possible cause of action that he had against Anderson and/or UM until he read an article on or about February 19, 2020, regarding a complaint filed with UM's Police Department by a student abused by Anderson, at which point Plaintiff became aware he was the victim of sexual assault and that UM indirectly or directly caused the abuse by being aware Anderson was a

sexual predator and failing to stop Anderson from harming students.

204.   Anderson also breached a fiduciary duty to Plaintiff, as he was his patient and a student athlete entrusted to Andersons's care, and so his failure to disclose material information to Plaintiff was fraudulent.

205.   Anderson further concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry, so he and Defendants could escape investigation, in that he:

> a.   prevented other medical professionals, coaches, trainers, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiff while he sexually assaulted Plaintiff; and
>
> b.   did not abide by or follow the standard and care which requires another medical professional, coach, trainer, parent, guardian, and/or caregiver be in the room during the examination and treatment of patients.

206.   Anderson's representations caused Plaintiff's injuries related to (1) the sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assault on or about February 19, 2020; and (3) discovering Plaintiff's beloved alma mater that he devoted his life to, in many respects, betrayed him by placing him in the care of a known sexual predator.

207.   Plaintiff incorporates, by reference, the paragraphs above and below regarding damages suffered by Plaintiff as a result of UM's responsibility for Anderson's sexual assaults, UM's awareness and responsibility for Anderson's fraudulent misrepresentations about the sexual assaults, and/or UM's fraudulent

misrepresentations.

208. Anderson committed Fraudulent Concealment by concealing fraud with affirmative acts designed and/or planned to prevent inquiry, so he and Defendants escape investigation.

209. At all times pertinent to this action, Anderson was an agent, apparent agent, servant, and employee of UM and operated within the scope of his employment, and his negligence is imputed to UM.

210. At all times material here, Plaintiff was free of any negligence contributing to the injuries and damages alleged.

**B.      Defendants' Fraudulent Concealment.**

211. Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, athletic directors, other athletic department representatives, and members of UM's administration, made affirmative representations to Plaintiff, referred to collectively as "Defendants' representations," that:

> a.      Anderson was to be trusted and not questioned, and his devotion to medical care at UM was worthy of public recognition and celebration, stating: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the

43

Annual Report to him," published in the Acknowledgement preface of Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980;

b.    Anderson was to be trusted and not questioned as his services were worthy of recognition by UM dedicating "the Annual Report to him" even though UM and its executives knew that Easthope had fired Anderson for his inappropriate sexual conduct toward male students;

c.    Anderson's genital groping and/or digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

d.    Anderson's genital groping and/or digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 25, with no reported issues related to his genitals;

e.    Anderson would treat their ailments and injuries in an ethical and competent manner, and therefore non-criminal manner;

f.    Anderson's genital groping and/or digital anal penetrations were just another required procedure athletes must endure as a part of the systemic athletic department culture in which athletes were rigorously disciplined to obey without question every requirement related to improving their physical health and, in doing so, adapting to overcome high levels of emotional, physical, and psychological stress and challenges; and,

g.    There was nothing wrong with anything Anderson did and so there was no possible cause to complain against Anderson and/or UM.

h.    These affirmative representations were reasserted each time Defendants, their agents in the Athletic Department, head coaches, assistant coaches, and trainers sent an athlete to Anderson for treatment as each order to see Anderson was an affirmative representation that Anderson was competent, ethical,

and would "do no harm", or assault the respective athletes.

212.    Defendants' representations were false. The UM's Public Safety Department's recent investigation involving contact with medical professionals establishes that extended genital examinations and digital anal penetrations are almost never needed for any physical or medical treatment of any other issues normally experienced by college athletes.

213.    Defendants knew the representations were false. Defendants received several complaints since, at least, 1968 about Anderson's sexual assaults prior to Plaintiff arriving on campus. Indeed, Defendants removed Anderson from his position as UHS Director in 1979 because of sexual assault allegations, thereby demonstrating UM's knowledge the representations were false.

214.    Defendants made the material representations, knowing they were false and/or made the material representations recklessly, without any knowledge of their truth and as a positive assertion, in that they had previously received strikingly similar complaints of abuse by Anderson from other students and student athletes and knew that the appropriateness of his genital examinations and digital anal penetrations had been questioned in the past.

215.    Defendants' representations were material, in that had Plaintiff known the representations were false, he would have stopped seeking treatment from Anderson immediately.

216.   Defendants' representations were made with the intent that Plaintiff would rely on them as UM sought to prevent Plaintiff from discovering he had a cause of action against Anderson and/or UM.

217.   Plaintiff did, in fact, rely on Defendants' representations; indeed, the representations led Plaintiff to continue seeking treatment from Anderson, and had he known the representations were false, Plaintiff would have stopped treating with Anderson.

218.   Defendants concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of fraud, in that they:

      a.     Refused to terminate Anderson and thus validated him through continued employment as a physician with one of the world's great institutions of higher learning;

      b.     Affirmatively lied in written publications about Anderson "resigning" from UHS when he was fired, and then reinstated but demoted him, for assaults on male students;

      c.     Ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Anderson's genital and anal examinations; and

      d.     Did not create a policy to require adults, parents, chaperones, guardians, and/or caregivers be present during an examination of a minor or young athlete by a physician.

219.   Defendants knew, and Plaintiff was in fact, particularly susceptible to believing Defendants' representations because:

      a.     Anderson's abuse occurred while Plaintiff was a young and naïve

adult;

b.    Defendants' representations were made within the context of a pervasive culture created by statements made by UM representatives, including coaches, trainers, directors, and other leaders of the Athletic Department, that Anderson's treatments were necessary and Anderson was a competent and ethical physician, to be trusted and never questioned;

c.    Plaintiff had little or no prior experience with legitimate and appropriately performed treatments that involve extended genital examinations and digital anal penetrations, so it was impossible for Plaintiff to differentiate a legitimate and appropriately performed genital and/or anal examinations from a sexual assault;

d.    Plaintiff could not have possibly known because there were no parents, coaches, guardians, caregivers, and/or other medical professionals in the room during the genital and anal examinations to observe, question, and/or discover that his genital examinations were sexual assaults and inform Plaintiff that he had been sexually assaulted and had a cause of action;

e.    Based on Neuroscience, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age of 25;

f.    Based on Neuroscience, as the prefrontal cortex of the brain matures teenagers are able to make better judgments;

g.    Plaintiff was intimidated by Anderson's notoriety and reputation and therefore believed his representations and followed protocol of football program to allow Anderson to act on Plaintiff;

h.    Plaintiff relied on the Athletic Department and trusted Anderson due to his notoriety and reputation;

i.    Plaintiff was compelled by Anderson to undergo improper medical examinations like other athletes and not question them if he wanted to stay on the team and remain at UM to earn his

47

college degree;

j.      Plaintiff had no reason to believe or be aware of any other students coming forward with allegations of abuse, particularly since Anderson and UM concealed any such allegations and since the culture of the Athletic Department normalized Anderson's treatments;

k.     Plaintiff had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Anderson; and

l.      Plaintiff was never told by Anderson that his conduct was sexual in nature, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from their parents and others.

220.   Accordingly, Plaintiff did not know, could not have reasonably known, and was reasonably unaware of a possible cause of action that he had against Anderson and/or Defendants until he read an article on or about February 19, 2020, regarding a complaint filed with UM's Police Department by a student abused by Anderson, at which point Plaintiff became aware he was the victim of sexual assault and that Defendants indirectly or directly caused the abuse by being aware Anderson was a sexual predator and failing to stop him from harming students.

221.   In addition to affirmative false representations, UM coaches, officials, agents, and representatives failed to disclose to Plaintiff that he was being sexually abused and that Anderson had a history of committing sexual assaults in the guise of medical treatment.

222.   Because UM had a fiduciary duty to Plaintiff, and it employed

Anderson who had a doctor-patient relationship with Plaintiff, the failure to disclose material information is also fraudulent.

223.  At all times pertinent to this action, the sports medicine trainers, trainers, employees, staff, managers, supervisors, coaches, and directors of Defendants were agents, apparent agents, servants, and employees of Defendants and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendants.

224.  Further, Plaintiff (and his parents) trusted and relied on his coaches' specific representations during his recruitment process that they would take care of and protect Plaintiff during his athletic career at UM, including, among others, taking care of his  (a) athletic needs through excellent coaching and training; (b) academic needs through tutoring and other academic support provided by the UM and its Athletic Department, if needed, and (c) medical needs through free quality health care to treat any injuries and illnesses Plaintiff incurred during his time on the team, which included access to UM's world-renowned hospital and a team of excellent doctors who were excellent, ethical, and would only do good, not harm, for the Plaintiff during the course of his medical treatments.

225.  Further, as pled above, during his time as an athlete for UM, Plaintiff's coaches and trainers repeatedly told Plaintiff that he would get the best medical treatment from UM's excellent medical facilities and doctors and trainers, and that

all medical treatment (and each individual treatment) would only be treatment that was medically necessary to treat his injury or illness, and that treatment would only be for the purposes of healing the Plaintiff, and doing the Plaintiff no harm

226.   Defendants' representations caused Plaintiff's injuries related to (1) the sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assault on or about February 19, 2020; and (3) discovering Plaintiff's beloved alma mater that he devoted his life to, in many respects, betrayed him by placing him in the care of a known sexual predator.

227.   Plaintiff incorporates, by reference, the paragraphs above and below regarding damages suffered by Plaintiff as a result of UM's responsibility for Anderson's sexual assaults, UM's awareness and responsibility for Anderson's fraudulent misrepresentations about the sexual assaults, and/or UM's fraudulent misrepresentations.

228.   Defendants committed Fraudulent Concealment, as described in detail above and below.

## COUNT I:
## VIOLATION OF TITLE IX, 20 U.S.C. § 1681(A), *ET SEQ*.[1]

229.   Plaintiff realleges and incorporates by reference the allegations

---

[1] Plaintiff outlines his damages, which is needed for many of the following counts, in general  allegations at the end of the counts section below, and those general damage allegations are incorporated by reference into all applicable counts to avoid excessive redundancy and for ease of reading by the Court.

contained in the previous and subsequent paragraphs.

230.   Title IX's statutory language states, "No person in the United States shall on the basis of sex, be ... subject to discrimination under any education program or activity receiving Federal financial assistance ..."

231.   Plaintiff is a "person" under the Title IX statutory language.

232.   UM receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX (of the Education Act of 1972, 20 U.S.C. § 1681(a), *et seq*.

233.   UM is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

234.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students and third parties.

235.   Anderson's actions and conduct were carried out under one of UM programs, which provides medical treatment to students, athletes, and the public.

236.   Anderson's conduct and actions toward Plaintiff, that being nonconsensual genital manipulation, constitutes sex discrimination under Title IX.

237.   As early as 1968, or earlier, an "appropriate person" at UM had actual knowledge of the sexual assault, abuse, and molestation of young men committed by Anderson.

238.   Specifically, Defendants were notified about Anderson's sexual abuse and molestation by young male students in or around 1968, 1969, 1975, 1979, and, on information and belief, on many other occasions before and after 1980.

239.   Defendants failed to carry out their duties to investigate and take corrective action under Title IX following the complaints of sexual assault, abuse, and molestation in or around 1968.

240.   After the 1968, 1969, 1975, and 1979 complaints, Anderson continued to sexually assault, abuse, and molest young male students, and later exclusively male athletes, including but not limited to Plaintiff.

241.   Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

   a.   Failing to investigate and address other victim's allegations as required by Title IX;

   b.   Failing to adequately investigate and address the complaints regarding Anderson's conduct; and,

   c.   Failing to institute corrective measures to prevent Anderson from violating and sexually abusing other students and individuals, including minors.

242.   Defendants acted with deliberate indifference as their lack of response to the allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of the known circumstances.

243.   Defendants' responses were clearly unreasonable as Anderson continued to sexually assault athletes and other individuals and Plaintiff until he

retired from UM in 2003.

244.   Between the dates of approximately 1968-2003, and perhaps earlier, Defendants acted in a deliberate, grossly negligent, and/or reckless manner when they failed to reasonably respond to Anderson's sexual assaults and sex-based harassment of young male students, and later young male student athletes, on and off school premises.

245.   Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received notice subjected Plaintiff to further harassment and a sexually hostile environment, effectively denying his access to educational opportunities at UM, including medical care.

## COUNT II:
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – STATE CREATED DANGER

246.   Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

247.   The due process clause of the 14th Amendment provides that the state may not deprive a person of life, liberty or property without due process of law.

248.   Defendants deliberately exposed Plaintiff to a dangerous sexual predator, Anderson, knowing Anderson could and would cause serious damage by sexually assaulting male students, especially male student athletes, on campus.

249.   This conduct was culpable in the extreme.

53

250.  Plaintiff was a foreseeable victim of Defendants' decision to make Anderson the physician to the UM Athletic Department.

251.  Plaintiff's sexual assault was foreseeable and direct.

252.  The decisions and actions to deprive Plaintiff of a safe campus constituted affirmative acts that caused and/or increased the risk of harm, as well as physical and emotional injury, to Plaintiff.

253.  Defendants acted in willful disregard for the safety of Plaintiff.

254.  Defendants have a fiduciary duty to protect students, like Plaintiff, from harm; and Defendants breached that duty by allowing Plaintiff's sexual assault by placing student athletes in the care of a known sexual predator.

255.  Defendants created the opportunity for Anderson to sexually assault Plaintiff that he would not otherwise have had the opportunity to do but for Defendants giving Anderson the job as Athletic Department physician when it was known to Defendants that he was a sexual predator.

256.  At all relevant times, Defendants and Anderson (as Defendants' agent) were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

## COUNT III:
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – RIGHT TO BODILY INTEGRITY

257.   Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

258.   The due process clause of the 14th Amendment includes an implied right to bodily integrity.

259.   Plaintiff enjoys the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

260.   At all relevant times, Defendants UM, UM Regents, and Anderson were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

261.   The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in Defendants' positions should have known.

262.   As a matter of custom, policy, and/or practice, Defendants had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

55

263.   Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

264.   Defendants' failure to address these patients' complaints led to an unknown number of individuals (aside from Plaintiff) being victimized, sexually assaulted, abused, and molested by Anderson.

265.   Additionally, Defendants' failure to properly address the 1968, 1969, 1975, 1979, and other complaints regarding Anderson's sexually assaultive conduct also led to others being victimized, sexually assaulted, abused and molested by Anderson.  Indeed, all that UM needed to do was fire Anderson in 1979.

266.   Ultimately, Defendants failed to adequately and properly investigate the complaints of Plaintiff or other similarly situated individuals including but not limited to failing to:

      a.    Not foist Anderson on the population of scholarship male athletes, who were accustomed to physical and emotional discomfort, and because they needed the scholarships, would be less likely to complain about Anderson's conduct;

      b.    Perform a thorough investigation into improper conduct by Anderson after receiving complaints; and

      c.    Thoroughly review and investigate all policies, practices, procedures and training materials related to the circumstances surrounding the conduct of Anderson.

267.   By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiff, and by failing to appropriately respond to reports of

Anderson's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983.

268.   Defendants are also liable to Plaintiff under 42 U.S.C. § 1983 for maintaining customs, policies, and practices which deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

269.   Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Anderson, with the result that Anderson was allowed to violate the rights of persons such as Plaintiff with impunity.

## COUNT IV:
## FAILURE TO TRAIN AND SUPERVISE UNDER 42 U.S.C. § 1983

270.   Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

271.   Defendants have the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Anderson and all faculty and staff regarding their duties toward students, faculty, staff and visitors.

272.   Defendants failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

      a.      Perceive, report, and stop inappropriate sexual conduct on

campus;

b.    Provide diligent supervision over student-athletes and other individuals, including Anderson;

c.    Report suspected incidents of sexual abuse or sexual assault;

d.    Ensure the safety of all students, faculty, staff, and visitors to UM's campuses premises;

e.    Provide a safe environment for all students, faculty, staff, and visitors to UM's premises free from sexual harassment; and,

f.    Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

g.    The above list of duties is not exhaustive.

273.   Defendants failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties which led to violations of Plaintiff's rights.

274.   Defendants' failure to adequately train was the result of Defendants' deliberate indifference toward the well-being of student-athletes.

275.   Defendants' failure to adequately train is closely related to or actually caused Plaintiff's injuries.

276.   As a result, Defendants deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

### DAMAGES FOR ALL CAUSES OF ACTION, COUNTS I-IV

277.   As a direct and/or proximate result of Defendants' conduct, Plaintiff suffered and suffers discomfort, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and such other injuries and physical manifestations as may appear during the course of discovery and trial in this matter.

278.   These irreparable harms Plaintiff suffers, and will continue suffering, are proven damages typically suffered by young men when sexually assaulted by another man who is a trusted person and/or medical provider.

279.   Symptoms of male sexual abuse on male adults can last for decades and affect their lives in many ways from causing sexual dysfunction and the inability to engage in close relationships with others to confusion about sexual identity, embarrassment and depression. See *Male Victims of Male Sexual Assault: A Review of Psychological Consequences and Treatment* (Sexual and Relationship Therapy, August 2001); *Effects of Sexual Assaults on Men: Physical, Mental and Sexual Consequences* (International Journal of Men's Health, Vol. 6, No. 1, Spring 2007, pp. 22-35).

280.   Psychological damage from sexual abuse is especially harmful when the perpetrator is known and trusted by the victim. See *Integration of Sexual Trauma in a Religious Narrative: Transformation, Resolution and Growth among*

*Contemplative Nuns* (Transcult Psychiatry, Feb 2013 – 50 (1): 21-46); *Victim*

*Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can*

*Respond* (EVAW's OnLine Training Institute, May 2019, p. 34).

281.   When sexual abuse is perpetrated by a medical provider, patients often

lack the ability to comprehend the abuse due to the provider's position of access,

trust and authority and commonly suffer from emotional distress, humiliation, and

the inability to trust medical care providers or the medical care professional

generally. See *Above All, Do No Harm: Abuse of Power by Health Care*

*Professionals*, by Kathleen S. Lundgren, Wanda S. Needleman, Janet W.

Wohlberg (2004), available at   https://www.therapyabuse.org/p2-abuse-of-

power.htm.

282.   In whole or in part, as a result of some or all of the above actions and/or

inactions of Defendants, Plaintiff has and continues to suffer irreparable harm as a

result of the violations.

**WHEREFORE,** Plaintiff requests this Court and the finder of fact to enter a

Judgment in Plaintiff's favor against Defendants on all counts and claims above in

an amount consistent with the proofs of trial, and seeks an award against Defendants

for all appropriate damages arising out of law, equity, and fact for each or all of the

above counts where applicable, including but not limited to:

> a.   Compensatory damages in an amount to be determined as fair
>      and just under the circumstances, by the trier of fact including,

but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiff's Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

b.      Punitive and/or exemplary damages in an amount to be determined as reasonable or just the trier of fact;

c.      Reasonable attorney fees, interest, and costs; and,

d.      Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

Respectfully submitted,

**The Mike Cox Law Firm, PLLC**

By /s/ Michael A. Cox
Michael A. Cox (P43039)
Jackie J. Cook (P68781)
Attorneys for Plaintiff
17430 Laurel Park Drive North, Suite 120E
Livonia, MI 48152
Dated: August 4, 2020          Telephone: (734) 591-4002

Respectfully submitted,

**Shea Law Firm PLLC**

By /s/ David J. Shea
David J. Shea (P41399)
Attorneys for Plaintiff
26100 American Dr., Ste. 200
Southfield, MI 48034
Telephone: (248) 354-0224
Dated: August 4, 2020          david.shea@sadplaw.com

61

## JURY DEMAND

Plaintiff, by and through his attorneys, Michael A. Cox, Jackie Cook and The Mike Cox Law Firm, PLLC, as well as David J. Shea, Ashley D. Shea and Shea Law Firm PLLC, hereby demand a trial by jury on all claims set forth above.

Respectfully submitted,

**The Mike Cox Law Firm, PLLC**

By /s/ Michael A. Cox
Michael A. Cox (P43039)
Jackie J. Cook (P68781)
Attorney for Plaintiff
17430 Laurel Park Drive North, Suite 120E
Livonia, MI 48152
Dated: August 4, 2020    Telephone: (734) 591-4002

Respectfully submitted,

**Shea Law Firm PLLC**

By /s/ David J. Shea
David J. Shea (P41399)
Attorneys for Plaintiff
26100 American Dr., Ste. 200
Southfield, MI 48034
Telephone: (248) 354-0224
Dated: August 4, 2020    david.shea@sadplaw.com